**WO**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT

## OF ARIZONA

| | |
|---|---|
| Gary Jerome Harper, | No.  CV 18-00298-PHX-DGC (CDB) |
| Plaintiff, | |
| vs. | **ORDER** |
| Charles L. Ryan, et al., | |
| Defendants. | |

Plaintiff Gary Jerome Harper, who is confined in the Arizona State Prison Complex-Florence, South Unit, brought this pro se civil rights action under 42 U.S.C. § 1983 against Arizona Department of Corrections (ADC) Director Charles L. Ryan and Corizon Health for the alleged denial of adequate healthcare in violation of the Eighth Amendment. (Doc. 1.)  Before the Court is Defendants' Motion for Summary Judgment.  (Doc. 61.) Harper filed his Response to the Motion, and, although ordered to do so, Defendants did not file a reply.  (*See* Doc. 64 at 3.)  The Court will deny Defendants' Motion.[1]

## I.  Background

Harper is terminally ill with cancer, and he alleged that Ryan set up and implemented policies that limit or deny treatment for terminally ill prisoners.  (Doc. 1.)

---

[1] Upon the filing of Defendants' Motion for Summary Judgment, the Court issued an order with the notice required under *Rand v. Rowland*, 154 F.3d 952, 960 (9th Cir. 1998) (en banc), which informed Harper of the requirements of Federal Rule of Civil Procedure 56 and set a briefing schedule.  (Doc. 64.)

Harper alleged that Corizon failed to comply with orders from the treating specialist, including orders for follow-up treatment and prescribed medications. (*Id.*) Harper also alleged that Corizon failed to provide medication and treatment for pain, fever, and complications related to his catheter. (*Id.*) According to Harper, Defendants failed to provide post-surgery follow-up treatment, treatment for an infection surrounding his suprapubic catheter, pain management treatment related to his cancer, and denied requests to send him to an oncologist. (*Id.*) Harper seeks injunctive relief and damages. (*Id.* at 10.)

Ryan and Corizon move for summary judgment on the grounds that (1) Harper cannot show that he suffered a constitutional violation as a result of a Corizon policy; (2) there is no evidence any Corizon agent was consciously aware of a serious risk to Harper's health and disregarded it; (3) Ryan cannot be liable as a supervisor because there is no evidence he was aware of Harper's medical issues and he had no direct involvement in Harper's healthcare; and (4) Harper fails to present evidence that a policy, practice, or custom caused him to suffer a constitutional injury. (Doc. 61.)

## II. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden then shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson*, 477 U.S. at 250; *see Triton*

*Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); see Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court does not make credibility determinations; it must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255; *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3). Further, where the nonmovant is pro se, the court must consider as evidence in opposition to summary judgment all of the pro se litigant's contentions that are based on personal knowledge and that are set forth in verified pleadings and motions. *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004); *see Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995).

Finally, where the plaintiff seeks injunctive relief, the court may also consider developments that postdate the motions to determine whether an injunction is warranted. *Farmer v. Brennan*, 511 U.S. 825, 846 (1994).

**III.    Relevant Facts**

In 2007, Harper was diagnosed with Hodgkin's lymphoma, and he had recurrences in 2011 and 2014. (Doc. 63 at 24.) His last oncology appointment was in 2014 with Dr. John Kelly in Tahoe, Nevada. (*Id.* at 24, 39.) Harper also suffers from idiopathic neurogenic bladder, testicular epididymitis (inflammation), and thyroid disorder, among other conditions. (*Id.* at 32, 34, 39.)

Harper entered the custody of the ADC in March 2017.[2]  On March 31, 2017, while at the Phoenix Alhambra Reception facility, Harper saw Dr. Sheldon Epstein for a physical.  (Doc. 62 ¶ 1; Doc. 68 ¶ 1.)  At this appointment, Harper was listed as 5 feet 11 inches tall and weighing 158 pounds.  (Doc. 63 at 2.)[3]  As to Harper's medical history, Dr. Epstein noted Hodgkin's lymphoma, remission 2014; bone marrow and left cervical node biopsies; radiation and chemotherapy 2007–2014; bedtime nausea; and chronic arthralgias (joint pain).  (Id.)  Dr. Epstein assessed the following: malignant neoplasm (growth of tissue); thyrotoxicosis (excess thyroid hormone), chronic pain syndrome, calculus of kidney (kidney stone), tachycardia, and nausea.  (Id. at 3.)  Dr. Epstein ordered Meclizine (for nausea), Meloxicam (for chronic pain syndrome), and Propranolol (for Tachycardia).  (Id. at 4–5.)  Dr. Epstein also issued Special Needs Orders (SNOs) for Harper to be given a lower bunk, catheter supplies, and daily showers.  (Id. at 5.)  In the "Plan Notes" section of the medical record, Dr. Epstein wrote that Harper needs an endocrine appointment.  (Id. at 5-6.)

On April 4, 2017, Harper saw Nurse Practitioner (NP) Denehy.  (Doc. 62 ¶ 2; Doc. 68 ¶ 2.)  Denehy noted that Harper had a history of an idiopathic neurogenic bladder and had an indwelling (inside the body) catheter up until three weeks before.  (Id.)  Harper had been removing the catheter himself but could no longer advance the catheter past what Harper described as a bladder sphincter.  (Id.)  Denehy contacted Dr. Malachinski, who recommended inserting a Foley urinary catheter and doing a urine culture lab test.  (Id.)  Physician Assistant (PA) Spizzirri attempted to insert the Foley catheter, but was unable to pass the catheter into the bladder in two attempts.  (Id.)  NP Denehy then got approval to send Harper to the hospital emergency room for insertion of an indwelling Foley.  (Id.)[4]

_____

[2]  See  https://corrections.az.gov/public-resources/inmate-datasearch  (search by prisoner number for "317663") (last visited Jan. 21, 2020).

[3]  The ADC Datasearch information for Harper shows that, when he entered ADC custody, he weighed 169 pounds.  See supra n.3.

[4]  Defendants did not submit the hospital medical records from the April 4, 2017 emergency room visit.  (See Doc. 63.)

The next day, Harper saw Dr. Izabela Musial for a follow up to the hospital visit. (Doc. 62 ¶ 3; Doc. 68 ¶ 3.) The medical records document that "Hospital discharge instructions reviewed and acted upon with additional changes see plan," but the hospital discharge records were not submitted to the Court. (Doc. 63 at 24.) Harper reported blood in his urine, a 30-pound weight loss in the last three months, loss of appetite, anxiety, and sweating. (*Id.*) In the "Assessment Notes," Dr. Musial wrote that Harper had "1. neurogenic bladder with difficult self-catheterizations; 2. nephrolithiasis [kidney stone] needs eval[uation]; 3. Hodgkin['s] lymphoma needs eval; 4. Hyperthyroidism not well controlled, needs labs and endocrinology input." (*Id.* at 26.) Dr. Musial started Harper on Ibuprofen and Oxybutynin as recommended by the emergency room and she documented that Harper needs referrals to urology and endocrinology. (*Id.* at 29.) A nurses' order was issued to get Harper's past medical records, and Dr. Musial also wrote "Please make sure that whatever yard [Harper] is transferred to that they order ASAP 1. Urology consult . . . 2. Endocrinology for controlling hypothyroidism possible Iodine radiation . . . 3. Oncology to eval[uate] Hodgkin's lymphoma." (*Id.* at 30.)

On April 11, 2017, Harper was transferred from Phoenix Alhambra Reception to the Florence South Unit, and on April 20, 2017, he saw NP Udoko for follow up. (*Id.* at 32.) NP Udoko documented that Harper needed follow up for thyroid enlargement and abnormal levels, that Harper was developing new lymph nodes behind his left ear, that self-catheterization had become difficult because the sphincter was closed, and that Harper was concerned about testicular epididymitis. (*Id.*) In the "Plan Notes," NP Udoko wrote "Nephrolithiasis – nephology consult request" and "Hodgkin's lymph[o]ma – oncology consult request." (*Id.* at 36.)

On May 3, 2017, Harper saw NP Udoko again for a chronic care visit to address Hodgkin's lymphoma and thyroid disorder. (Doc. 62 ¶ 5; Doc. 68 ¶ 5; Doc. 63 at 39.) Harper reported that his Hodgkin lymphoma was in remission but he had developed 2 nodes behind his ear. (Doc. 63 at 39.) Harper reported weight loss (8 pounds in 10 days), night sweats, poor appetite, and nausea—for which he had medication that was helping.

(*Id.*)  Harper also reported that he was taking medication for his thyroid, but he was tired all the time, he could not work, and he could not take Ditropan (bladder relaxant) for his bladder situation because it caused blindness, and he requested non-duty status.  (*Id.*)  In the "Objective Notes," Udoko noted "left mastoid – nodular tissue with swelling" and "enlarged nodes – cervical left greater than right with tenderness on palpation." (*Id.* at 41.)  Udoko requested an oncology consult.  (*Id.* at 46.)

On June 26, 2017, Harper went to the Arizona Oncology Network for an oncology appointment with Dr. Sanueev Gopal.  (Doc. 62 ¶ 6; Doc. 68 ¶ 6; Doc. 63 at 49–50.)  Harper reported to Dr. Gopal that his Hodgkin's lymphoma had been in remission since 2014, but he began having symptoms three months ago and had lost 45 pounds in the last 6 months.  (Doc. 63 at 49.)  Dr. Gopal conducted a thorough exam and noted symptoms that included fatigue, nausea, vomiting, anorexia, headaches, new mastoid nodules and swollen lymph nodes in the left neck.  (*Id.* at 50.)  Dr. Gopal assessed Harper's history of Hodgkin's lymphoma and ordered a PET/CT for evaluation and staging; labs, including a complete blood count; and copies of Harper's past treatment and chemo-radiation records from the Nevada medical center.  (*Id.*)  Dr. Gopal wrote that if a reoccurrence is confirmed, Harper will need a radiation oncology consult.  (*Id.*)  Dr. Gopal recommended "maximizing nutrition, due to weight loss." (*Id.*)  Lastly, Dr. Gopal ordered follow-up in 2 weeks "or as soon as possible with labs and PET/CT results." (*Id.*)

On July 2, 2017, Harper submitted a Health Needs Request (HNR) asking to see a provider due to weight loss and swollen lymph nodes.  (Doc. 63 at 96.)

On July 5, 2017, Harper saw NP Udoko for a follow up from the off-site oncology appointment.  (Doc. 62 ¶ 7; Doc. 68 ¶ 7.)  NP Udoko noted the recommendations for an urgent PET/CT, labs tests, and a referral to radiation/oncology.  (Doc. 63 at 52.)  NP Udoko also documented Harper's reports of sharp, shooting pain from the left side of his neck radiating up the base of the skull.  (*Id.*)  Udoko ordered Codeine for the Hodgkin's lymphoma, lab tests, and a chest x-ray, and he submitted a consult request for radiology. (*Id.* at 55–56.)

On July 11, 2017, Harper's catheter fell out, and the nurse on duty was unable to replace it. (Doc. 62 ¶ 8; Doc. 68 ¶ 8.) Harper was taken to the emergency room at Mercy Gilbert Medical Center. (*Id.*; Doc. 63 at 68.)[5] The next day, Harper returned from Mercy Gilbert after placement of a Foley catheter, and he denied any pain or discomfort. (Doc. 63 at 68.) That same day, NP Udoko submitted a consult request for radiology PET/CT scan, priority "urgent," in light of the diagnosis of Hodgkin's lymphoma and the June 26, 2017 consult report from Dr. Gopal. (*Id.* at 83–84; Doc. 68-1 at 43.)

On July 18, 2017, Harper saw Nurse Owiti for complaints of pain in the shaft of his penis and testicles, although he denied burning or irritation, blood in urine, or discharge. (Doc. 63 at 87.) The Plan Notes stated "will continue to monitor." (*Id.* at 93.)

Also on July 18, 2017, Corizon Utilization Management documented that the urgent request for a PET/CT scan, which NP Udoko submitted on July 12, was denied in lieu of "Alternative Treatment Recommended." (Doc. 68-1 at 43.) There are no records or explanation for the denial, nor is there a record or documentation of the recommended alternative treatment.

On July 25, 2017, Harper saw Dr. Rodney Stewart. Harper reported severe testicle and penile pain for 3-4 days and green-colored drainage from the tip of his penis, and he expressed concern about weight loss and painful neck lymph nodes. (Doc. 63 at 96.) A urinalysis dip indicated a urinary tract infection (UTI). (*Id.*) Dr. Stewart assessed urethritis/epididymitis and "Hodgkin's Lymphoma; patient needs to follow up with oncology and obtain previously requested studies." (Doc. 63 at 99.) Dr. Stewart prescribed Codeine/APAP (Tylenol 3) and antibiotics. (*Id.* at 102, 107; Doc. 62 ¶ 9; Doc. 68 ¶ 9.)

On August 2, 2017, an Incident Command System was called for a medical emergency after Harper tripped and his Foley catheter was pulled out. (Doc. 62 ¶ 10.) The responding nurse noted that Harper's penis was red around the urethra, and there was brown/red urine in the leg bag. (*Id.*) Unsuccessful attempts were made at inserting two

---

[5] Defendants did not submit the medical records from Mercy Gilbert Medical Center for the July 11–12, 2017 hospital visit. (*See* Doc. 63.)

different catheters, and Harper suffered severe pain. (*Id.*) Harper was sent to Banner Baywood Hospital for catheter insertion. (*Id.*) Harper returned from the hospital that same day with a new Foley catheter secured with stat-lack, a special taping system. (*Id.*) The nurse documented in the medical record that a call was made to Dr. Johnson and a message was left to inform him of Harper's return and that the hospital recommended antibiotics. (Doc. 63 at 124).[6]

On August 6, 2017, Harper was seen by Nurse Jessica Dixon after he submitted an HNR stating he was in massive pain in his lymph nodes and testicles and that he was still not on pain medications and antibiotics. (*Id.* at 131.) Dixon noted in the record that the hospital had ordered Macrobid 100 mg (an antibiotic). (*Id.* at 132.) Harper reported that his pain medication—Tylenol 3—ran out and he was still in a lot of pain and that he went to the nurse line on August 3, 2017, but nothing was done for him and he was told return on August 6. (*Id.*) Nurse Grafton issued an order for Ibuprofen for 60 days. (*Id.* at 141.)

On August 8, 2017, Harper saw Dr. Johnson for follow up regarding the Alternative Treatment Plan in place of the PET scan that had been requested twice. (*Id.* at 147.) Dr. Johnson wrote in the record that Harper asked for Gabapentin or Tramadol, but he told Harper that neither were indicated for lymphoma or chronic pain, so he offered non-steroidal anti-inflammatory drugs (NSAIDS) instead, and Harper walked out of the exam room. (*Id.*) Harper asserts that he never asked for Gabapentin or Tramadol at this encounter, but instead requested a renewal of Tylenol 3. (Doc. 68 ¶ 11.) He asserts that Dr. Johnson became belligerent, at which point Harper walked out and filed an Inmate Grievance to the Medical Director about the incident. (*Id.*)

In his Inmate Grievance, dated August 8, 2017, Harper wrote that he was grieving Dr. Johnson's unbecoming and unprofessional conduct at that day's encounter. (Doc. 68, Ex. B (Doc. 68 at 4).) Harper wrote that he wanted to discuss all his medical issues, but Dr. Johnson told him he was there only "to figure out the fucking PET scan." (*Id.*) Harper

---

[6] Defendants did not submit the hospital medical records from the August 2, 2017 visit. (*See* Doc. 63.)

wrote that he tried to bring up his August 2 emergency room visit and he told Dr. Johnson that he was in severe, constant pain and needed his Tylenol 3 renewed, but Dr. Johnson continued to rudely tell him he was not being seen for that and that he "was not [Harper's] fucking drug dealer." (*Id.*) Harper documented that he then walked out of the office as Dr. Johnson continued to cuss at him. (*Id.*)

On August 10, 2017, Harper saw Dr. Ngwube for a chronic care appointment to address Hodgkin's lymphoma. (Doc. 63 at 154.) Dr. Ngwube documented Harper's reports of weight loss and neck pain and history of Hodgkin's lymphoma. (*Id.*) At this time, Harper—at 5 feet 11 inches tall—weighed 127 pounds. (*Id.* at 155.) Dr. Ngwube assessed emaciation and wrote "will determine if go straight to PET/CT with the [amount] of clinical findings we have thus far from both [patient] and past." (*Id.* at 157.) Dr. Ngwube also wrote that, for Harper's hyperthyroidism, "will get USG [ultrasound] the neck for further eval[uation] of the thyroid," and that the ultrasound "may help us with possible other masses in the neck." (*Id.*) Dr. Ngwube ordered prescriptions for Ibuprofen and Tylenol. (*Id.* at 158.)

On September 3, 2017, Harper filed two HNRs stating that he had a urinary tract infection and pain, and that his Foley catheter was overdue to be changed. (*Id.* at 172.) That same day, Harper was seen in medical by Nurse Jacob Bromberg, who noted that Harper was presenting after 30 days with the same Foley catheter from the August 2, 2017 emergency room visit. (*Id.*) Bromberg noted the onset of a urinary tract infection with cloudy and odorous urine and complaints of testicular pain. (*Id.*) A urinalysis was positive for a UTI. (*Id.*) Bromberg documented that Harper was "educated on why medical on site could not change Foley [due to] troubles with reinsertion[,]" and that the provider was contacted and orders were given for antibiotics. (*Id.* at 180.)

Medical records reflect that on September 9, 2017, Harper reported to Nurse David Rodriguez that it was time to replace his Foley catheter. (*Id.* at 183.) The medical note documents that "due to reported [history], and Foley catheter intact, will refer to provider." (*Id.* at 184, 189.)

Medical records reflect that on September 15, 2017, Harper saw Nurse Nicole Schaffer for a Foley catheter change. (*Id.* at 192.) The medical note documents that the Foley catheter was changed and the procedure was tolerated well by the patient. (*Id.*)

On September 20, 2017, Harper had an offsite urology appointment with Dr. Galaxy P. Shah, who performed a cystoscopy (an endoscopy of the urethra and bladder) and an "open SPT placement," which involves inserting a suprapubic tube/catheter into the bladder through the lower abdomen. (Doc. 62 ¶ 16; Doc. 63 at 200–201.)[7]

On September 22, 2017, NP Gay submitted a routine urology consult request. (Doc. 63 at 202, 205.)

On September 26, 2017, Harper had a radiology off site appointment for a PET/CT scan. (*Id.* at 209.)[8]

On October 2, 2017, Harper saw NP Gay, who noted that the suggested labs and PET/CT scan were completed, and they were awaiting records. (*Id.* at 216.) NP Gay documented that Harper had lower quadrant discomfort without vomiting and a 45-pound weight loss. (*Id.*) The medical record for this date shows that the routine urology consult request submitted on September 22 was cancelled. (*Id.* at 220.) There is no documentation of the reason for the cancellation. Gay documented in the "Plan Notes" her assessment of "1. Non Hodgkin's lymphoma, possible remission 2. Idiopathic neurogenic bladder and that suggested cystoscopy with supra pubic cath consultation sent 3. Pain management; will consider naproxen as needed for now." (*Id.* at 221.)

Defendants assert that on October 4, 2017, NP Gay put in an order for Morphine Sulfate pain medication. (Doc. 62 ¶ 17.) But the medical record they cite for support shows that the Morphine Sulfate order was discontinued by NP Gay that same day.

---

[7] Defendants did not submit the results of the cystoscopy and the post-procedural instructions/orders from Dr. Shah. (*See* Doc. 63 at 201 (citing "Instructions" from Dr. Shah and stating that the orders were printed and "sent with guards").)

[8] Defendants did not submit the medical records from the September 26, 2018 offsite radiology visit, nor did they submit the PET/CT scan results. (*See* Doc. 63.)

(Doc. 63 at 227.)[9]  Similarly, Defendants assert that on October 9, 2017, a prescription for Ciprofloxacin HCL (an antibiotic) was added pursuant to a verbal order from NP Gay, but the medical record shows that the prescription was discontinued.  (Doc. 62 ¶ 17; Doc. 63 at 232.)

On October 18, 2017, medical staff changed the Foley catheter.  (Doc. 63 at 249.) NP Gay documented that Harper had a pending urology procedure and that she reviewed the CAT scan results with Harper.  (*Id.* at 252.)[10]

On October 23, 2017, Harper saw NP Gay for a chronic care visit, and she documented that his labs were within normal limits and his PET scan showed no lymphadenopathy (diseased or abnormal lymph nodes) of the chest, neck, abdomen or pelvis.  (*Id.* at 255, 261.)[11]  NP Gay documented Harper's abnormal weight loss of 35 pounds over the last 6 months, and she documented a plan of care to add Naproxen for pain, drink three cans of Ensure a day, weekly weight checks, and labs every 90 days.  (*Id.* at 262–263.)  The medication Oxybutynin (a bladder relaxant) was discontinued on this date.  (*Id.* at 263.)

On October 30, 2017, Harper saw Dr. Glen Babich to discuss the PET scan results. (Doc. 68 ¶¶ 19, 43.)  Dr. Babich informed Harper that the PET scan showed abnormal

---

[9] Harper points out that the October 4, 2017 medical record reflects that the "Encounter Close Date" was July 11, 2018—nine months after the date of the encounter. (Doc. 68 ¶ 17; Doc. 63 at 223.)  He argues that this and other medical records showing "Encounter Close Dates" that are days, months, and in one case 2 years after the subject encounter raise questions as to the authenticity of the medical records because medical staff could back date entries.  (Doc. 68 ¶ 17.)  Harper submits the copy of a December 19, 2018 letter written by Rita Lomio, an attorney with the Prison Law Office, which represented the plaintiffs in *Parsons v. Ryan*, CV 12-00601-ROS.  (Doc. 68, Ex. M (Doc. 68-2 at 30).)  Ms. Lomio wrote the letter to defense counsel regarding Harper's need for medical care, and the letter identifies specific instances of back dated changes to some of Harper's medical records.  (*Id.* (Doc. 68-2 at 31–33).)  In failing to file a reply in support of their Motion for Summary Judgment, Defendants do not explain the difference in the actual encounter dates and "Encounter Close Dates," nor do they deny that some of Harper's medical record entries were back dated.

[10] Defendants did not submit any CAT scan results.  (*See* Doc. 63.)

[11] Defendants did not submit the PET scan results or the radiology report from the PET scan.  (*See* Doc. 63.)

spinal imaging, that Harper's cancer was spreading into the bone, and that he needed an immediate consult with oncology. (*Id.* ¶ 43.) This same date, Dr. Babich documented in a "Consultation Request Action" form that Harper's scan showed "abnormal spinal imaging" and that Harper "needs to follow up with oncology. Site provider to schedule oncology consult." (Doc. 68-1 at 42.)[12]

On November 8, 2017, Harper was seen in medical due to his Foley catheter slipping and the need to hold it in place. (Doc. 63 at 266.) The Foley catheter was changed. (*Id.* at 267.)

On November 12, 2017, Levofloxacin (an antibiotic) was ordered due to a positive urine culture. (*Id.* at 276, 279–280.) On November 16, 2017, Harper saw NP Gay for a possible UTI, and he reported brown urine and discomfort. (*Id.* at 282.) The plan of care was to stop Levofloxacin; add Nitrofurantoin (an antibiotic), a topical cream, and a sulfide shampoo; and set up a plan for further catheter changes. (*Id.* at 287.)

On November 27, 2017, Harper was taken to Maricopa Integrated Health Services for a suprapubic catheter placement outpatient surgery, which was performed by Dr. Shah. (Doc. 68 ¶ 44; Doc. 68, Ex. ZZ, Harper Decl. (Doc. 68-3 at 86).) Dr. Shah prescribed NORCO (acetaminophen and hydrocodone) and Senna tablets (a laxative) following the surgery. Upon his return to the prison, however, Harper was given Tylenol 3 instead, and Docusate (a laxative) was ordered. Harper never received the medication. (Doc. 68 ¶ 21.) The post-operative directions instructed Harper to return in 4 weeks for follow up with Dr. Shah, removal of sutures, and the first suprapubic catheter change, and to return every 4 weeks thereafter for suprapubic catheter changes. (*Id.* ¶¶ 30, 44; Doc. 68, Ex. ZZ, Harper

---

[12] Neither the medical record of the October 30, 2017 encounter with Dr. Babich, nor the October 30, 2017 Consultation Request Action form were provided by Defendants. (*See* Doc. 63.) Nor were these records provided to Harper during discovery despite his specific request to defense counsel for "the complete medical record and consultation request action from 10-30-2017 by Dr. Glen Babich." (Doc. 68-1 at 45; Doc. 68-2 at 42.) Defendants' written response to Harper's request was that they sent him his relevant medical records, and if the October 30, 2017 record existed, it should be within the medical records already sent to him. (Doc. 68-2 at 42.) Harper obtained the October 30, 2017 Consultation Request Action form from attorney Ms. Lomio and submitted it with his Response to Defendants' Statement of Facts. (Doc. 68 ¶¶ 19, 43; Doc. 68-1 at 42.)

Decl.)[13]

On December 4, 2017, Harper was seen for a catheter dressing change and he complained of pain. (Doc. 63 at 306.) Nurse Litten noted odor when the bandage was removed and green/yellow pus-like fluid around the incision site. (*Id.*) Dr. Johnson was notified, and Ciprofloxacin (an antibiotic) and Codeine/APAP were added. (*Id.* at 306, 310.)

On December 14, 2017, Harper saw Nurse Emily Gant for a Foley catheter dressing change. (*Id.* at 314.) Harper complained of severe abdominal pain, and he reported that the catheter was not draining. (Doc. 63 at 314–315.) Upon removal of the dressing, there was a foul odor and brown-yellow drainage covering the previous dressing and catheter insertion site. (*Id.* at 315.) The opening of the catheter was cleaned, and it was noted that the stoma was light pink and moist and there were obvious signs and symptoms of infection. (*Id.*) Harper was using a leg strap that medical had given him to hold the catheter in place, and, since the catheter was not draining, the strap was loosened and lowered, which facilitated proper drainage flow of urine through the tubing. (*Id.* at 316; Doc. 68 ¶ 23.) Nurse Gant telephoned the on-call provider regarding Harper's pain and status, and the provider gave verbal orders for one tablet of Tylenol 3 and IV fluids, after which Harper reported relief and was sent back to his cell. (Doc. 63 at 316, 321.)

On December 27, 2017, Harper submitted an HNR stating that he was supposed to return to Dr. Shah for removal of his stitches, and he requested to be sent to the urologist for removal of the stitches or he would remove them himself "since medical will not do anything for infection around the stitches." (Doc. 68-2 at 47.)

On January 3, 2018, Harper was seen by NP Gay for a catheter change, even though Dr. Shah had ordered that Harper return to the urologist for a catheter change. (Doc. 63 at 340, 343; Doc. 68 ¶ 30.) Harper's urine tested positive for possible infection, and he was

---

[13] Defendants did not submit the medical records from the November 27, 2017 off-site visit and procedure by Dr. Shah. (*See* Doc. 63.) Harper was not provided Dr. Shah's report and consultation record upon request; Defendants informed him that these records do not exist. (Doc. 68, Ex. ZZ, Harper Decl. (Doc. 68-3 at 88).)

prescribed Ciprofloxacin (an antibiotic) for three days.  (Doc. 63 at 344–345.)

The following day, around 8:30 p.m., an ICS was activated after Harper complained of severe abdominal pain and pressure in his groin.  (*Id.* at 347.)  Harper was brought to medical, and he reported that his pain had begun the day after his catheter was changed.  (*Id.* at 348.)   The dressing was removed, and there was a foul odor present and brown/yellow drainage.  The catheter opening was cleansed, and it was noted that the stoma was light pink and there were obvious signs and symptoms of infection.  (*Id.* at 349.)  Harper also complained that the catheter bag was not draining.  (*Id.*)  He had his catheter bag tied below the medical strap that medical had issued to him, and the bag was twisted.  (*Id.*; Doc. 68 ¶ 26.)  The bag was loosened and lowered to facilitate proper drainage flow.  (Doc. 63 at 349.)  The provider was called, and verbal orders were given for a one-time dose of Toradol (brand name for Ketorolac, an NSAID for pain) and IV fluids, after which Harper reported relief.  (*Id.*)

On January 4, 2018, Harper submitted an Inmate Informal Complaint Resolution stating that he had a suprapubic catheter placed by a urologist on November 27, 2018, after which he developed complications, but medical staff failed to adequately treat the complications and infection and they discontinued his pain medication despite severe, excruciating pain that limits his mobility and affects his sleep and appetite.  (Doc. 68-2 at 48.)  Harper wrote that medical staff also discontinued his medication to treat bladder spasms, and they failed to return Harper for a four-week follow up as ordered by the urologist.  (*Id.*)  Harper complained that only a physician was supposed to change his catheter, yet a nurse did so on January 3, and he has since suffered severe spasms and burning in his bladder.  (*Id.* at 49.)[14]

---

[14] On April 5, 2018, three months after submitting his Inmate Informal Complaint Resolution, Harper received a response from Nurse C. Hawley, which informed him not to send informal complaints to the Health Unit for a response and that informal complaints must go to the CO III for a timely response.  (Doc. 68-2 at 48.)  Harper avers that he submitted his Inmate Informal Complaint Resolution to the CO III.  (Doc. 68, PSOF ¶ 45.)  Further, under the ADC grievance procedures, if an Informal Complaint Resolution relates to a medical issue, "[t]he Contract Facility Director of Nursing shall respond to the Informal Complaint within 15 workdays using the Inmate Informal Complaint Response

On January 5, 2018, NP Gay gave a verbal order for another Ketorolac dose, and it was noted that Harper was to follow up with the provider the next day. There was no follow up. (*Id.* at 359, 362–363.)

On January 7, 2018, Harper had an unscheduled sick call visit in the medical clinic with Nurse Litten, to whom he reported severe, constant and extreme pain and spasms in his bladder. (*Id.* at 365.) The provider was called, and a verbal order for a one-time dose of Ketorolac was given. (*Id.* at 366.) The Plan Notes indicated a referral to the provider for further evaluation. (*Id.* at 372.) The following day, NP Gay ordered another dose of Ketorolac and a one-day prescription for Phenazopyridine (a pain reliever for the lower part of urinary tract). (*Id.* at 375, 379.)

On January 8, 2018, Harper submitted another HNR informing medical that he had severe, constant, and extreme pain/spasms in his bladder. (Doc. 68-2 at 52.)

On January 9, 2018, just after midnight, an ICS was initiated due to Harper experiencing bladder spasms and pain in the bladder. (*Id.* at 382.) Nurse Tyleana Vinson documented that Harper reported pain at a 7/10 level, that traces of blood were in the urine, and that the catheter bag had brown colored urine. (*Id.* at 383.) A new order for Tylenol was issued. (*Id.* at 383, 388.) Later that day, around 4:00 p.m., NP Natalya Weigel submitted a routine consult request for Harper to see the urologist. (*Id.* at 396, 400.) Harper had not seen the urologist since his November 27, 2017 surgery despite the specialist's order that Harper was to return for follow up 4 weeks after the procedure. (Doc. 68 ¶ 28.)

Also on January 9, 2018, Harper submitted an HNR to medical stating he had severe pain to the suprapubic tube and requested that it be removed. (Doc. 68-1 at 73.) Harper received a response to the HNR two days later, and he was informed that the provider will discuss a plan of care. (*Id.*) At about 6:00 p.m. on January 9, 2018, Harper went to medical complaining of bladder pain. (Doc. 63 at 402.) Nurse Weigel noted that he was treated for reoccurring UTIs a couple times in the past month, and that he requested Tylenol 3 tablets.

form." *See ADC Department Order 802, Inmate Grievance Procedure*, §§ 2.0, 2.3.3.1, https://corrections.az.gov/sites/default/files/policies/800/0802 032519.pdf (last visited Jan. 7, 2020).

(*Id.*)  Weigle ordered Augmentin/amoxicillin twice a day for 2 weeks.  (*Id.* at 406–407).

On January 17, 2018, Harper saw Dr. James Baird for a chronic care visit to address Hodgkin's lymphoma and possible hyperthyroidism.  (*Id.* at 410.)  Dr. Baird assessed "Hodgkin's lymphoma, last PET scan neg[ative;] likely hyperthyroidism with tachycardia." (*Id.* at 416.)  This appears to refer to the same PET scan that Dr. Babich had reported showed abnormal spinal imaging.  (*See* Doc. 67 at 6.)  Dr. Baird ordered a prescription for Methimazole (an antithyroid agent), ordered labs, and discontinued Propranolol (a beta blocker).  (Doc. 63 at 417–418.)

On January 19, 2018, Harper submitted an HNR stating that he had severe pain in his testicles and the suprapubic tube and asked for the tube to be removed.  (Doc. 68, PSOF ¶ 47.)

On January 26, 2018, Harper had an offsite visit with Dr. Shah, the urologist. (Doc. 62 ¶ 30; Doc. 68 ¶ 30.)[15]  Dr. Shah recommended that Harper return every 4 weeks for a Foley catheter change.  (Doc. 62 ¶ 30.)  Dr. Shah also recommended an ultrasound of the testicles and scrotum, and he ordered the following medications: NORCO (pain medication), Colace (stool softener), Nitrofurantoin (an antibiotic), Codeine/APAP, and Oxybutynin.  (*Id.*; Doc. 68 ¶ 30; Doc. 63 at 426.)  None of the recommended medications were initially ordered.  (Doc. 68 ¶ 30; *see* Doc. 63 at 425.)  Upon his return to the prison, it was noted that Harper requested the pain medication recommended by the urologist.  (Doc. 63 at 428.)  The records show that a four-day prescription for Tylenol 3 was ordered.  (*Id.* at 432.)

On January 31, 2018, Harper was seen by NP Weigel, who documented that Harper appeared to be in pain with mild shaking and teariness to eyes.  (*Id.* at 434.)  She noted the catheter stoma appeared reddened with scant cream-colored drainage.  (*Id.*)  Weigel ordered that Harper be given supplies weekly for dressing changes and that Tylenol 3 for 30 days be added.  (*Id.* at 438.)

---

[15] Defendants did not submit Dr. Shah's medical record for the January 26, 2018 visit.  (Doc. 68 ¶ 30; *see* Doc. 63.)

On February 1, 2018, Harper was seen in medical by NP Weigel for urology follow up and he reported that the pain medication was not working. (*Id.* at 441.) He was told to use antibacterial soap to clean the stoma every day, split gauze as dressing around the catheter daily, and to keep the skin around the catheter site cool and dry. (*Id.* at 446–447.)

On February 7, 2018, Harper submitted an HNR informing medical that his suprapubic incision discharge was heavier. There was no response to the HNR. (Doc. 68, PSOF ¶ 49; Doc. 68-2 at 58.) This same day he also submitted an Inmate Informal Complaint Resolution stating that he was being denied dressing changes, medications, and antibiotics. (Doc. 68-2 at 60.)[16]

On February 8, 2018, Harper was seen by NP Weigel for a physical assessment and scrotum examination pursuant to a request by the Corizon Utilization Management team. (*Id.* at 448.) Harper reported a concern about a painful abscess on his left calf. (*Id.*) Weigel noted that there was no swelling in the testicles, but there was a palpable and movable mass in the epididymis (the duct/tube at the back of the testis) that was tender to touch. (*Id.*) Weigel assessed a carbuncle on the limb and a hydrocele. (*Id.* at 449, 451.)[17] Weigel ordered Cephalexin (an antibiotic) for one week. (*Id.* at 452–453.)

On February 11, 2018, Harper submitted another Inmate Informal Complaint Resolution stating that he was denied supplies needed for his suprapubic catheter. (Doc. 68-2 at 62.)[18]

---

[16] Nurse C. Hawley responded to this Informal Complaint Resolution on April 5, 2018, and informed Harper that informal complaints should go to the CO III for processing. (Doc. 68-2 at 60.) *See supra* n.15.

[17] A carbuncle is a cluster of boils that form a connected area of infection under the skin; a carbuncle can cause a deeper and more severe infection that a single boil. *See Boils and carbuncles – Symptoms*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/boils-and-carbuncles/symptoms-causes/syc-20353770 (last visited Jan. 7, 2020). A hydrocele is a type of swelling in the scrotum that occurs when fluid collects in the thin sheath surrounding a testicle. *See Hydrocele – Overview*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/hydrocele/symptoms-causes/syc-20363969 (last visited Jan. 7, 2020).

[18] Harper submitted his February 11, 2018 Informal Complaint Resolution to a CO III. On April 5, 2018, he received a response informing him that he should submit his informal complaints to his CO III for prompt processing. (Doc. ¶ 68, PSOF ¶ 51; Doc. 68-

On February 2, 2018, Harper presented to medical for follow up related to his suprapubic catheter, bladder spasms, and pain. (Doc. 63 at 456.) He saw NP Weigel, who issued a prescription for Nitrofurantoin Mono (for UTI). (*Id.* at 460–461.)

On February 27, 2018, Harper saw NP Weigel in medical for a suprapubic catheter change, despite Dr. Shah's order that Harper return to the urologist every 4 weeks for catheter changes. (*Id.* at 463; Doc. 68 ¶ 30; *see* Doc. 67 at 6.) The last catheter change had been January 3, 2018, so the February 27 catheter change was approximately 23 days overdue. (*See* Doc. 63 at 340, 343.)

On March 27, 2018, Harper went to medical and showed the nurse that his suprapubic site was bleeding heavily and he was bleeding through his boxers and t-shirt. (*Id.*) He was told that if the bleeding continues to file an HNR to be seen on the Nurse Line. (*Id.* at 76–77.) Later that evening, other prisoners escorted Harper to medical due to the continued bleeding from the suprapubic site. (*Id.* at 77.) A couple of sergeants then escorted Harper into the medical lobby and telephoned a nurse at another facility because there was no on-site night nurse at Harper's facility. (*Id.*) The sergeants were told that if the blood was not in the urinary bag, it was not serious, and to send Harper back to his cell with directions to submit an HNR to medical the next day. (*Id.*)

On April 6, 2018, Harper's suprapubic catheter site was bleeding heavily and draining green discharge, so he walked to medical where NP Weigel saw him and asked why the site was not covered. Harper explained that he had been denied supplies. (*Id.* at 79–80; Doc. 68, PSOF ¶ 57.) NP Weigel informed the nurses on duty that Harper was not to be denied supplies and that his site is to be covered at all times. (*Id.*) The suprapubic site was cleaned and dressing was placed on it. (*Id.*)

On April 10, 2018, Harper saw NP Weigel and reported that infection symptoms and his pain had worsened. Harper was told to continue with the current medication regimen. (Doc. 68-1 at 83.) During this encounter, Harper asked Weigel about the status of the ultrasound that Dr. Shah had recommended and for which Weigel had submitted a

2 at 62.)

consult request months before. Weigel informed Harper that the consult request was denied on the basis that it was determined not to be a necessity. (*Id.* at 83–84.)[19]

On April 12, 2018, Harper submitted an HNR stating that he still had green, thick pus discharge, that his incision opening was puffy and swollen, and that he had severe pain. (Doc. 68, PSOF ¶ 61.)

On April 17, 2018, Harper went to medical around 10:30 a.m. after another prisoner pulled out his catheter. (Doc. 68-1 at 88.) NP Gay changed Harper's suprapubic catheter; the last catheter change had been February 27, 2018, so the catheter change was approximately 26 days overdue. (*Id.* at 89; Doc. 63 at 476; Doc. 67 at 6.) NP Gay used a different type of catheter—a "straight cath" instead of a "French Codex"—and the insertion was severely painful and resulted in pain so severe that Harper could not walk. (Doc. 68-1 at 89.) The medical record documented "acute pain," and Harper was prescribed a two-day prescription for Ciprofloxacin HCL (an antibiotic) and ice. (*Id.*; Doc. 63 at 479–480.)

On April 19, 2018, Harper was transferred to Special Management Unit (SMU) I. (Doc. 68-1 at 90.) Although Harper had SNOs for no stairs, a lower bunk, daily showers, and supplies, he was assigned to a top tier cell and a top bunk, he was denied a daily shower, and he did not receive any supplies to clean or cover the suprapubic site. (*Id.* at 91.) Nor was Harper provided with his medical diet. (*Id.*)

On April 21, 2018, Harper received a shower. (*Id.*) At this time, he was coughing

---

[19] Defendants did not submit the medical record for the April 10, 2018 encounter. (*See* Doc. 63.)

Defendants submitted a medical record dated April 11, 2018, which included a note by Nurse Roberta Box stating that Harper came to medical to ask if he could get his Tylenol 3 dose early that day due to bladder pain, but per NP Weigel, he was told to wait until the scheduled medication time. (Doc. 63 at 474.) Box also wrote that Harper declined Ibuprofen and that he left and then returned with his other medications and said he was not going to take any of his medications anymore. (*Id.*) Harper confirms that he requested to receive his pain medication two hours early that day, and NP Weigel denied his request. (Doc. 68-1 at 84.) But Harper did not return his medications as noted in the record. (Doc. 68 ¶ 33.) Harper submits copies of relevant ADC policies providing that had he returned his prescribed medications as noted by Nurse Box, a refusal for medication form would have been required to be completed, and Harper would have been subject to a disciplinary ticket. (*Id.*, citing Ex. D (ADC Dep't Order 1101, §§ 1101.3, 1.7, 1.7.1, 1.7.1.1), Ex. E (Refusal to Submit to Treatment Form), and Ex. K (ADC Dep't Order 803, § 6.0).)

up blood daily, suffering worsening night sweats, discharging green pus at the suprapubic site, and he still had not received medical supplies or his Ensure supplements. (*Id.*) Harper requested HNR forms, but they were not available. (*Id.*) In the following days, his symptoms worsened, and he still did not receive any supplies, his medical diet, or his Ensure, nor did he receive daily showers. (*Id.*)

On April 24, 2018, Harper saw NP Siji Thomas. He reported that he was on antibiotics for chronic UTIs, but he was not currently getting the antibiotic medication. (Doc. 63 at 484.) At this encounter, Harper's weight was documented at 120 pounds. (*Id.*) NP Thomas assessed a UTI and suspected infection at the suprapubic catheter site. (*Id.* at 487.) NP Thomas issued a two-week prescription for Ciprofloxacin HCL, swabbed the catheter site, and ordered follow up in 4 weeks. (*Id.* at 488–489.) Thomas also ordered showers, supplies, and Ensure three times a day. (Doc. 68-1 at 92.) The lab culture tested positive for MRSA (resistant Staphylococcus aureus). (Doc. 63 ¶ 35 (in part); Doc. 68 ¶ 35.)

Despite the order for showers, Harper still did not get a daily shower from April 24 to April 28, 2018, nor did he receive medical supplies or his medical diet and Ensure supplements. (Doc. 68-1 at 93–94.) He finally received a shower on April 29, 2018, but no supplies. (*Id.* at 95.)

On April 30, 2018, Nursing Director Tanna Gualco issued a verbal order for Sulfameth-Trimeth (or Bactrim, an antibiotic), presumably to treat the MRSA infection. (Doc. 63 at 491, 495, 505.) But Harper is allergic to this medication—it is listed on his allergy list, and Harper explained that he is allergic to it. (Doc. 68-1 at 95.)

From May 1 to May 3, 2018, Harper did not receive medical supplies. (Doc. 68, PSOF ¶ 74.)

On May 4, 2018, Harper submitted an Inmate Informal Complaint Resolution to grieve Corizon's denial of the ultrasound that had been recommended by Dr. Shah. He requested a second decision or an explanation as to why the ultrasound was denied. (Doc. 68-2 at 78.)

Harper was not given any medical supplies from May 5 through May 9, 2018, at which time he received limited supplies. (Doc. 68, PSOF ¶ 76.) Thereafter, he did not receive medical supplies, he received periodic showers, and his catheter was not changed until June 5, 2018, when the catheter became fully dislodged while Harper was climbing the ladder to his bunk. (Doc. 68-1 at 99–107.) On June 5, 2018, a nurse changed the suprapubic catheter/tube and applied dressing to the site. (*Id.* at 107.) The last catheter change had been April 17, 2018 – the catheter change was approximately 19 days overdue. (Doc. 63 at 476.) Harper was told he would be on suicide watch for 24 hours pursuant to an order by NP Thomas, and Harper was placed in a medical cell. (Doc. 68-1 at 107; Doc. 63 at 511.) The medical note documented that the medical watch was to make sure Harper did not pull out the catheter. (Doc. 63 at 511.) Harper was kept in the medical suicide watch cell until 4:00 p.m. on June 8, 2018, at which time he finally received a shower. (Doc. 68-1 at 107–108.)

From May 21 to June 22, 2018, Harper did not receive any medical supplies, and he received only 10 showers, despite the ongoing infection at the suprapubic site, continued green pus drainage, and worsening pain. (*Id.* at 112; Doc. 68, PSOF ¶ 78.)

On June 22, 2018, Harper submitted an HNR stating that he had granulated tissue around the suprapubic site and daily movements were painful. (Doc. 68-2 at 82.) He was seen the following day in medical, and the incision was cleaned and he received a dressing change. (Doc. 68, PSOF ¶ 79.)

On June 27, 2018, Harper submitted an HNR to the nursing supervisor asking to speak with her about the denial of daily showers despite his SNO, and about the denial of daily dressing changes. (Doc. 68-3 at 1.)

From June 28 to July 11, 2018, Harper received only 8 showers and 4 dressing changes, and by July 11, 2018, he was 8 days overdue for a catheter change. (Doc. 68, PSOF ¶ 82.)

On July 12, 2018, Harper saw NP Gay, who discontinued his Tylenol 3 pain medication even though the prescription, written by NP Weigel, was valid until October 22,

2018.  (*Id.* ¶ 83.)  NP Gay substituted Motrin.  (Doc. 68-3 at 6.)  That same day, Harper wrote an Inmate Informal Complaint Resolution directed to Director Ryan and Director of Medical Richard Pratt.  Harper complained about NP Gay's discontinuation of pain medication.  (*Id.*)  Harper also complained that ever since Dr. Shah had placed the suprapubic tube catheter, it had never been changed on time, and currently he was 10 days overdue for a catheter change.  (*Id.*)  Harper explained that despite medical orders for daily dressing changes, he had only had 2 dressing changes in 3 weeks.  (*Id.*)

Harper wrote a second Inmate Informal Complaint Resolution on July 12, 2018, directed to Deputy Warden Kimble, in which he wrote that in March 2018 he had attempted to resolve this problem with ADC Director Ryan and Warden Thompson – specifically, the problem of inadequate medical care.  (*Id.* at 3.)  Harper explained that he is currently suffering an MRSA infection and Corizon has taken him off pain medication, and he is not receiving daily dressing changes and timely catheter changes.  (*Id.* at 3–4.)  Harper wrote that he is in fear of his organs shutting down, and he requested assistance from the Deputy Warden in contacting the Medical Director and addressing the negligence and lack of pain medications.  (*Id.* at 4.)

On July 13, 2018, Harper wrote an Inmate Letter directed to Director Ryan and Medical Director Richard Pratt stating that it is their responsibility to ensure that Corizon provides adequate healthcare and that Harper is currently being denied medications, catheter changes, and dressings, and he asked that the situation be addressed.  (*Id.* at 8.)

On July 15, 2018, Harper submitted an HNR stating that his suprapubic catheter "is hurting really bad and bleeding[,] daily movements and walking hurts," and he requested removal of the suprapubic tube.  (*Id.* at 11.)

Between July 15 and August 5, 2018, Harper received only 4 dressing changes. (Doc. 68, PSOF ¶ 86.)

On August 6, 2018, in response to an HNR complaining that the antibiotics were not working, Harper saw Nurse Tress Goff, who changed the catheter.  This catheter change was 36 days overdue.  (*Id.* ¶ 87; Doc. 68-1 at 128; Doc. 63 at 538, 545.)  Nurse Goff noted

that the suprapubic area was red with purulent discharge, and a verbal order for a one-week prescription of Minocycline (an antibiotic) was issued.  The record shows that this medication order was discontinued at the pharmacy.  (Doc. 63 at 544–545.)

From August 8 to August 17, 2018, Harper submitted 5 HNRs requesting to see the urologist and complaining of "constant," "severe," and "extreme pain" and spasms.  (Doc. 68, PSOF ¶ 88; Doc. 68-3 at 13–17.)  In the following weeks, Harper filed a couple Inmate Informal Complaint Resolutions complaining about the denials of Ensure and daily showers—even though he had blood and urine on his linen and clothing.  (Doc. 68-3 at 20–21.)

On August 29, 2018, Harper was transferred from SMU I to the Cook Unit.  (*Id.* at 19.)  The next day, Harper submitted an HNR stating that he had pain at his catheter site, that he needed pain medication renewed, that his infection was worsening, that he had green pus and was bleeding, and that he was in constant, extreme, and severe pain.  (*Id.* at 24.)

From September 1 to September 22, 2018, Harper submitted 9 HNRs informing medical that he was in severe and extreme pain, he was overdue for a catheter change, he had continuous bleeding, his testicles were swollen, and his infection was worsening.  (*Id.* at 26–34; Doc. 68, PSOF ¶ 90.)

On September 17, 2018, NP Thomas conducted a culture swab of the suprapubic site-wound and discharge.  (Doc. 68, PSOF ¶ 90; Doc. 68-3 at 46.)  The culture results, dated September 22, 2018, were positive for MRSA and reported "heavy growth" of MRSA, and recommended contact precaution.  (Doc. 68-3 at 41.)  The medical records document that NP Thomas was notified of this result on September 24, 2018, and upon review, he noted in the record that Harper was to be seen by a provider "ASAP."  (*Id.* at 42.)

Meanwhile, on September 19, 2018, Harper went to medical due to continuous blood in his urine, bleeding from the catheter site, and worsening infection.  (*Id.* at 48.)  Harper was told that medical does not take walk-ins, even though he showed medical staff

his bloody urinary drainage bag and his blood-soaked dressing pad. (*Id.*) As he was leaving, Lieutenant Laux inquired as to Harper's condition. After Harper explained the encounter with medical, Laux insisted that due to the blood, this was a safety and security issue, and he instructed officers to keep Harper in the medical unit and if the nurse and NP would not see Harper, the officers were to immediately activate an ICS to force medical to see Harper. (*Id.*)[20]

In the month of October, Harper submitted 3 HNRs about his chronic conditions and informed medical that he had bladder pain, he had bleeding and green discharge, his suprapubic site was still infected, he had excruciating pain, his pain medication needed to be renewed, and his testicles were swollen. (Doc. 68, PSOF ¶ 91; Doc. 68-3 at 55–57.) From October 2 to October 19, 2018, Harper filed 4 grievances in which he complained about medical's failure to renew his pain medication, medical staff's refusal to see Harper or provide sufficient treatment when they did see him, and the policies set up by Director Ryan that led to inadequate care. (Doc. 68, PSOF ¶ 91; Doc. 68-3 at 50–53.)

On October 25, 2018, Harper saw Dr. Stewart, who assessed chronic cystitis (inflammation of bladder), Hodgkin's lymphoma and lack of follow up as recommended, and a neurogenic bladder and need for urology follow up. (Doc. 63 at 548, 552.)[21] Dr. Stewart ordered urgent consult requests for oncology and for radiology; specifically, an MRI, ultrasound, and CAT scan. (*Id.* at 554.) He also ordered a routine consult request for urology. (*Id.*) Dr. Stewart documented in the Plan Notes "restart Ditropan [bladder relaxant][;] oncology appointment with Ironwood Cancer Center[;] urology follow up[;]

_____

[20] Defendants did not submit any of Harper's medical records for the period between August 6 to October 25, 2018. Therefore, it is not clear from the record what, if any treatment, Harper received during this time and, specifically, what treatment he received on September 19, 2018. (*See* Doc. 63.)

[21] In December 2018, Ms. Lomio from the Prison Law Office began advocating for Harper's medical care, and in two letters to Director Ryan's counsel, one dated December 7, 2018, and one dated December 19, 2018, Ms. Lomio quoted portions of Dr. Stewart's notes from the October 25, 2018 medical record. (Doc. 68-2 at 28–29, 31.) In the medical records submitted with Defendants' Motion for Summary Judgment, it appears that these portions of the October 25, 2018 medical record have been slightly altered. (*Compare* Doc. 63 at 548, 552 *with* Doc. 68-2 at 28–29, 31.)

- 24 -

U/A . . . [;] labs, . . . abdominal U/S [ultrasound] to include the bladder, kidneys, and testicles." (*Id.*)[22]

On November 21 and 25, 2018, Harper submitted HNRs informing medical that his catheter changer was 7 days overdue. (Doc. 68, PSOF ¶ 92; Doc. 68-3 at 59–60.)

On December 7, 2018, attorney Ms. Lomio wrote a letter to Director Ryan's counsel on Harper's behalf, informing counsel that Dr. Stewart's October 25, 2018 urgent request for oncology consult was not referred to Corizon Utilization Management for review until almost a month later. (Doc. 68-2 at 28.) She also wrote that Dr. Stewart's request for a urology consult was not sent to Corizon Utilization Management for review until November 29, 2018, and that neither the oncology consult nor the requested urology consult had occurred. (*Id.* at 29.) Ms. Lomio requested that Harper immediately be seen by an oncologist and urologist and that he receive all appropriate follow-up care. (*Id.*)

On December 19, 2018, Ms. Lomio wrote another letter to Director Ryan's counsel. (*Id.* at 30.) This letter informed counsel that Harper was last seen by an oncologist on June 26, 2017—541 days ago. (*Id.*) Ms. Lomio quoted that oncologist's note that Harper had a history of Hodgkin's lymphoma and was currently exhibiting serious symptoms and that he "will need PET/CT for evaluation and staging . . . if reoccurrence is confirmed, [patient] will need a radiation oncology consult," and to follow up in "2 weeks or as soon as possible with labs and PET/CT results." (*Id.*) Ms. Lomio pointed out that 486 days later, on October 25, 2018, Dr. Stewart submitted an urgent oncology consult request and noted that Harper had not seen an oncologist since that June 2017 visit. (*Id.* at 31.) Finally, Ms. Lomio noted that although the medical records showed that Harper received a PET/CT scan in September 2017, which resulted in a report of "abnormal spine images – needs to follow up with oncology," no oncology consult was thereafter requested or scheduled. (*Id.*

---

[22] Defendants assert that on November 23, 2018, Harper was seen off-site for an ultrasound of the bladder and that there were no significant findings. (Doc. 62 ¶ 38.) But the exhibit cited in support of this assertion is the October 25, 2018 medical record of the encounter with Dr. Stewart. (*Id.*, citing "Exhibit LL.") The Court finds no record of any appointment or procedure on November 23, 2018, and no record of any ultrasound results. (*See* Doc. 63.)

at 33.) Ms. Lomio requested that Ryan's counsel ensure Harper immediately be seen by an oncologist and urologist and receive all appropriate follow-up care. (*Id.* at 34.)[23]

On December 22, 2018, Harper saw Nurse Susan Jensen in response to an HNR and he reported increasing testicular pain, new lymph nodes in his neck and groin, and worsening Hodgkin's symptoms. (Doc. 63 at 557.) The Nurse referred Harper to a provider. (*Id.* at 564.)

On January 2, 2019, Harper saw NP Hahn, who noted a hard nodule on the right testicle with swelling, a posterior small pea size nodule on the left cervical chain of Harper's neck, and testicular pain. (*Id.* at 570, 574.) NP Hahn submitted an urgent consult request for an ultrasound of the testicles and scrotum, and he noted that "CAT scan of bilateral cervical neck consult[s] have been placed f[or] review of UTM [Utilization Management] Committee." (*Id.* at 576.)[24]

On January 8, 2019, Harper underwent a wound culture swab. (Doc. 68-3 at 64.) On January 16, 2019, he submitted an Inmate Informal Complaint Resolution complaining that he had not yet been informed of the results from this culture. (*Id.*) Harper filed a second Informal Complaint complaining that the oncology consult requested by Dr. Stewart was cancelled without reason. (*Id.* at 65.) And he filed a third Informal Complaint complaining that the urology consult was required to be scheduled within 60 days of Dr.

---

[23] Ms. Lomio's December 19, 2018 letter also expressed concern over "apparent and unexplained changes" made to Harper's medical record since her review of the record on December 7, 2019. (Doc. 68-2 at 30–33.) Ms. Lomio pointed out the changes that appeared in the medical record, and she requested that defense counsel provide an explanation for the backdated changes. (*Id.* at 31–34.)

[24] Harper submitted the copy of January 4, 2019 letter he received from Ms. Lomio, who informed him that she reviewed his medical record and, according to the record, NP Hahn submitted an urgent radiology consult request on January 2, 2019, with the following comments quoted from the medical record: "USN [ultrasound] OF SCROTUM TESTICLES AND BILATERAL CERVICLE C[HAIN] LARGE FIRM NODULE FIXED ON EXAMINATION TO LEFT CERVICLE AREA NECK PLEASE EVALUATE THIS WITH CAT SCAN PLEASE HX [history] OF MALIGNANT LYMPHOMA SEE HIS NOTES AS WELL PLEASE." (Doc. 68-2 at 37.) These comments do not appear in the medical record that Defendants submitted with the Motion for Summary Judgment. (*See* Doc. 63 at 570–576.) Thus, it appears that the January 2, 2019 medical record submitted by Defendants is not complete.

Stewart's request, which was made on October 25, 2019, but he was now apparently scheduled for urology in April 2019, more than 5 months later. (*Id.* at 66.) The responses to these Informal Complaints, all dated February 1, 2019, informed Harper that on January 30, 2019, NP Hahn submitted a consult request for an MRI/CT and that "sometimes it takes a while to get appointments." (*Id.* at 69–72.)

On January 23, 2019, Harper filed another Informal Complaint that although he had an active SNO for specific medical supplies, he had not received those supplies since November 20, 2018, despite suffering from an open, bleeding, and infected wound. (*Id.* at 68.) There is no record of any response.

On February 8, 2019, Harper underwent an ultrasound on the scrotum and testicles. (Doc. 63 at 579.) The ultrasound report documented small bilateral hydroceles and a simple-appearing left epididymal cyst measuring 3 mm. (*Id.* at 580.)

On February 27, 2019, Harper had an off-site appointment with Dr. Whitman, a general surgeon, for his neck swelling. (*Id.* at 582–583.) Dr. Whitman noted obvious cervical lymph adenopathy and cervical adenopathy, and documented that Harper needed to have a cervical node biopsy. (*Id.* at 583.)

On March 18, 2019, Harper underwent a biopsy procedure performed by Dr. Whitman. (*Id.* at 584–585.) The biopsy report/diagnosis indicated two benign lymph nodes. (*Id.* at 586.)

On March 27, 2019, Harper had on off-site urology consult. (*Id.* at 590.) Defendants did not submit the medical record from the urology visit, and Defendants did not identify the urologist. (*Id.* at 590–598.) Defendants assert, and Harper does not dispute, that the provider recommended changing the catheter every two weeks for the next two changes and application of Neosporin at entry site every day. (Doc. 63 ¶ 41; Doc. 68 ¶ 41.) Upon his return from this appointment, Harper expressed concerns about the urology appointment, and he reported that he still had pain, that the doctor had told him to ejaculate more, and that the doctor was an idiot. (Doc. 63 at 591.) The medical records show that Harper's next catheter changes were on April 6, 2019, and then a month later, on May 11,

2019. (*Id.* at 601, 608.)

On March 29, 2019, Harper saw Dr. Whitman again for follow up, and he was informed of the biopsy results. (*Id.* at 588.) Dr. Whitman noted that the left neck incision was well healed and post-op changes were normal. (*Id.*)

As of July 2019, Harper was waiting to see an oncologist and undergo another PET scan that had been requested by medical personnel at Ironwood Cancer Center. (Doc. 68, PSOF ¶ 96.)

## IV.    Claim Against Corizon

### A.    Legal Standard

To support a § 1983 claim against a private entity performing a traditional public function, such as providing medical care to prisoners, a plaintiff must allege facts to support that his constitutional rights were violated as a result of a policy, decision, or custom promulgated or endorsed by the private entity. *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138–39 (9th Cir. 2012) (extending the "official policy" requirement for municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978), to private entities acting under color of law). Under *Monell*, a plaintiff must show: (1) he suffered a constitutional injury; (2) the entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional injury. *See Monell*, 436 U.S. at 691–94; *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001).

### B.    Discussion

#### 1.    Constitutional Injury

##### a.    Eighth Amendment

To support a medical care claim under the Eighth Amendment, a prisoner must demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). There are two prongs to the deliberate-indifference analysis: an objective standard and a subjective

standard.  First, a prisoner must show a "serious medical need." *Id.* (citations omitted).  A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted).  Examples of indications that a prisoner has a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* at 1059–60.

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent.  *Jett*, 439 F.3d at 1096.  "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they 'deny, delay or intentionally interfere with medical treatment.'" *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990) (quoting *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988)).  Deliberate indifference may also be shown where prison officials fail to respond to a prisoner's pain or possible medical need.  *Jett*, 439 F.3d at 1096.  "In deciding whether there has been deliberate indifference to an inmate's serious medical needs, [courts] need not defer to the judgment of prison doctors or administrators.'" *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (quoting *Hunt v. Dental Dep' t*, 865 F.2d 198, 200 (9th Cir. 1989).

Even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must demonstrate harm caused by the indifference.  *Jett*, 439 F.3d at 1096; *see Hunt*, 865 F.2d at 200 (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).

### b.    Discussion

Defendants make no argument that Harper did not suffer from a serious medical need.  (*See* Doc. 61.)  There can be no dispute that Harper's neurogenic bladder condition, which required use of a catheter, his thyroid disorder, and his possible recurrence of

Hodgkin's lymphoma were conditions worthy of comment and treatment and, absent treatment, could result in significant injury or unnecessary pain. *See McGuckin*, 974 at 1059–60.

As to the deliberate indifference prong, Defendants argue there is no evidence that any Corizon agent was consciously aware of a serious risk of harm to Harper's health and disregarded it. (Doc. 61 at 15.) Defendants submit that Harper's conditions were appropriately monitored and his HNRs were reasonably responded to. (*Id.*) Defendants also contend that Harper himself was "at fault in inhibiting his healing process" and "played a role in causing himself pain" because on numerous occasions he was noncompliant with medications and treatment. (*Id.* at 15, 18.)

Every Corizon staff member who interacted with Harper could see that his condition required use of a catheter. Every medical record includes a list of Harper's diagnosed conditions and current medications. Every medical staff member who saw Harper or responded to one of his HNRs or medical grievances was aware of his serious conditions and ongoing treatment needs. Harper reported his serious symptoms, including severe pain, in numerous HNRs, and the medical records documented his reports of bladder pain, bleeding, discharge, swollen lymph nodes and testicles, and neck pain. Defendants cannot credibly argue that the medical staff who treated Harper were unaware of his objectively serious symptoms, including swollen lymph nodes and testicles, bleeding from his catheter site and a green discharge with foul odor, and his significant weight loss. Even the partial evidence submitted with this motion amply demonstrates that Corizon staff members were subjectively aware of Harper's serious medical needs.

As to the contention that Harper was noncompliant and therefore caused himself pain, Harper directly disputes Defendants' factual assertions that he refused treatment or medications, and, as Harper points out, Defendants did not submit any "Refusal to Submit to Treatment" forms to support that Harper ever refused treatment or medication. (Doc. 62 ¶¶ 18, 25, 33, 37; Doc. 68 ¶¶ 18, 25, 33, 37; *see* Doc. 63.) Regardless, whether Harper contributed to his own harm would be a factual question reserved for the jury.

Defendants further argue that although Harper claims that the urologist ordered Harper to return for follow up and removal of stitches after his November 27, 2017 procedure, there is no record the urologist made any order for a return visit. (Doc. 61 at 15.) But Defendants did not submit the medical record from the November 27, 2017 urology visit. (*See* Doc. 63; supra n.13.) Consequently, they provide no evidence to refute Harper's sworn statement that the urologist informed him to return in four weeks for removal of the stitches. (*See* Doc. 68 ¶ 44; Doc. 68, Ex. ZZ, Harper Decl.)[25]

In their Motion, Defendants fail to address the medical evidence showing that numerous recommendations and orders issued by treating specialists for scans, medications, and follow up, as well as numerous consult requests for scans and specialist appointments—some "urgent"—submitted by treating providers, were ignored, canceled, or denied by Corizon Utilization Management without explanation. (*See* Doc. 63 at 50, 55–56, 83–84, 99, 202, 205, 220, 426, 554; Doc. 68-1 at 42, 43; Doc. 68-2 at 28–31, 34, 47, 78; Doc. 68-3 at 65; Doc. 68 ¶ 44.) For example, on June 26, 2017, Harper was seen by an oncologist who ordered follow up within 2 weeks or sooner, but there was no follow up. (Doc. 63 at 50.) On October 30, 2017, Dr. Babich ordered the site provider to schedule an oncology consult, but this order was apparently ignored and no oncology appointment was scheduled. (Doc. 68-1 at 42.) A year after that, on October 25, 2018, the treating provider submitted an urgent consult request for an oncology appointment. (Doc. 68-2 at 30–31; Doc. 63 at 554.) A month later, the October 25, 2018 consult request was cancelled by Corizon. (Doc. 68-2 at 31.)

In January 2018, Dr. Shah, the treating urologist, recommended an ultrasound of the scrotum and testicles, and the treating NP submitted a consult request for the procedure.

_____

[25] "To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial . . . ." *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001); *see Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003). The Court considers Harper's statement as to what Dr. Shah told him because Harper can testify at trial as to what Dr. Shah told him, and Dr. Shah can testify at trial and be cross-examined, thus removing any hearsay objection. *See* 5 Wigmore, Evidence § 1362 (Chadbourn rev., 1974). Moreover, in failing to file a reply, Defendants did not object to or dispute Harper's statement.

Corizon denied the consult request ostensibly on the basis that it was unnecessary. (Doc. 63 at 426; Doc. 68-1 at 83–84; *see* Doc. 68-2 at 78.) There is no documentation of the decision to deny this consult request. Ten months later, on October 25, 2018, Dr. Stewart submitted another consult request for an ultrasound, which was to include the testicles. (Doc. 63 at 554.) There is no evidence of any response to this consult request. On January 8, 2019, NP Hahn submitted an urgent consult request for an ultrasound of the scrotum and testicles. This consult request was finally addressed, but only after an attorney began reviewing Harper's medical records and advocating for medical treatment on his behalf. (Doc. 63 at 576; Doc. 68-2 at 37.) Harper finally underwent an ultrasound of the scrotum and testicles on February 8, 2019—more than a year after the specialist recommended the procedure. (Doc. 63 at 579.)

Indeed, In March and April 2017, immediately after Harper's arrival at the ADC, Drs. Epstein and Musial documented that Harper needed an endocrine appointment and a referral to endocrinology "ASAP." (Doc. 63 at 5–6, 30.) These orders were apparently ignored, as there is no evidence that Harper ever saw an endocrinologist.

Deliberate indifference is exhibited where a plaintiff demonstrates that medical staff chose a course of treatment that was "medically unacceptable under the circumstances" and "that they chose this course in conscious disregard of an excessive risk to [the prisoner's] health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996); *see Jett*, 439 F.3d at 1097–98 (jury could find deliberate indifference where the prison doctor was aware that the plaintiff needed to see an orthopedist for treatment and the plaintiff was not taken to the orthopedist for 6 months). The Ninth Circuit and other courts have routinely found that failure to follow a treating specialist's or even a treating physician's recommendation may amount to a course of treatment that is medically unacceptable. *See Colwell v. Bannister*, 763 F.3d 1060, 1069 (9th Cir. 2014) (denying summary judgment where prison officials "ignored the recommendations of treating specialists and instead relied on the opinions of non-specialist and non-treating medical officials who made decisions based on an administrative policy"); *Snow v. McDaniel*, 681 F.3d 978, 988 (9th Cir. 2012) (where

the treating physician and specialist recommended surgery, a reasonable jury could conclude that it was medically unacceptable for the non-treating, non-specialist physicians to deny recommendations for surgery), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014); *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999) (the defendant physician's refusal to follow the advice of treating specialists could constitute deliberate indifference to serious medical needs); *McNearney v. Wash. Dep't of Corrs.*, C11-5930 RBL/KLS, 2012 WL 3545267, at *26 (W.D. Wash. June 15, 2012) (in granting a preliminary injunction for specialist treatment, the district court found that the prisoner plaintiff showed a likelihood of success on the merits of her Eighth Amendment claim where the defendants failed to follow an orthopedic surgeon's strong recommendation for further orthopedic evaluation).  The evidence in this case shows multiple failures to comply with the treating specialists' and treating physicians' recommendations and orders.  A reasonable jury could find that Corizon staff was deliberately indifferent to Harper's serious medical needs.

The fact that Harper was "monitored," as Defendants contend, and seen frequently by medical staff, by no means prevents a finding a deliberate indifference.  (Doc. 61 at 15.) *See Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000) (prisoner does not have to prove that he was completely denied medical care).  A failure to competently treat a serious medical condition, even if some treatment is prescribed, can constitute deliberate indifference.  As the Ninth Circuit has noted, "access to medical staff is meaningless unless that staff is competent and can render competent care." *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989); *see also Estelle*, 429 U.S. at 105 & n. 10 (the treatment received by a prisoner can be so bad that the treatment itself manifests deliberate indifference).  The record shows that Corizon staff repeatedly failed to follow through on treating specialists' and treating physicians' recommendations, often failed to address Harper's pain and bleeding, delayed catheter changes, and often refused to provide necessary medical supplies for cleaning and dressing Harper's suprapubic catheter site and wound.  Defendants' assertion that Harper "was provided with necessary medications pursuant to

recommendations from offsite visits" is utterly unsupported, as almost none of the medical records from the offsite visits were submitted. (Doc. 61 at 15; *see* supra n.4–6, 8, 13, 15, 19.)

Moreover, the medical records show that on numerous occasions Harper's pain medication was improperly stopped or staff failed to renew it, despite physician's orders and Harper's HNRs informing staff of his medical needs and ongoing severe and excruciating pain. (*See* Doc. 63 at 131, 141, 227, 432; Doc. 68-2 at 48; Doc. 68-3 at 6, 11; Doc. 68 ¶¶ 30, 83, 91.) The record reflects that pain medication, antibiotics, and medication to treat bladder spasms were inexplicably discontinued. (*See* Doc. 63 at 232, 263, 544–545; Doc. 68-3 at 6.) And after Harper was diagnosed with a MRSA infection, he was prescribed an antibiotic to which he was allergic, even though this allergy information was in his medical records. (Doc. 63 at 495, 505; Doc. 68-1 at 95.) The ongoing and repeated failure to timely change Harper's catheter, provide necessary medical supplies, and properly administer Harper's medications strongly suggests that medical staff acted with deliberate indifference to Harper's medical needs. *See McGuckin*, 974 F.2d at 1060–61 ("a finding that the defendant repeatedly failed to treat an inmate properly . . . strongly suggests that the defendant's actions were motivated by 'deliberate indifference' to the prisoner's medical needs"); *Wood*, 900 F.2d at 1334 ("[i]n determining deliberate indifference, we scrutinize the particular facts and look for substantial indifference in the individual case, indicating more than mere negligence or isolated occurrences of neglect"). A reasonable jury could readily find that Corizon medical staff failed to treat Harper's serious medical needs competently, and acted with deliberate indifference.

The final question in the Eighth Amendment analysis is whether Harper suffered harm as a result of Defendants' deliberate indifference. *See Jett*, 439 F.3d at 1096; *Hunt*, 865 F.2d 198. This is not a difficult issue. Harper avers that as a result of the lack of adequate medical care he has suffered excruciating pain, and the medical record and HNR evidence documents ongoing, constant, and severe bladder pain; painful catheter changes; and painful recurring UTI infections and MRSA infections. (*See* Doc. 1 at 5; Doc. 63 at

131, 141, 227, 432; Doc. 68-2 at 48; Doc. 68-3 at 6; Doc. 68 ¶¶ 30, 83, 91.)   In his declaration dated June 27, 2019, Harper avers that antibiotics have not cured the internal MRSA infection and it has been left untreated.  (Doc. 68-3 at 87.)  He further avers that he now has 16 swollen lymph nodes throughout his left and right lymphatic tract.  (*Id.* at 88.) *See S. Cal. Housing Rights Ctr. v. Los Feliz Towers Homeowners Ass'n*, 426 F. Supp. 2d 1061, 1070 (C.D. Cal. 2005) (a declarant has personal knowledge of his or her own symptoms).  Harper's ongoing UTI and MRSA infections and pain could be found to constitute harm sufficient to support an Eighth Amendment claim.  *See Estelle*, 429 U.S. at 103 (Eighth Amendment applies even to "less serious cases, [where] denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose"); *McGuckin*, 974 F.2d at 1060 (pain and anguish suffered by prisoner constituted harm sufficient to support a § 1983 action); *see also Newell v. Ngu*, 589 F. App'x 782 (7th Cir. 2014) (the plaintiff's testimony that he suffered from recurring urinary tract infections and experienced pain and discomfort during the extended period that his catheter was not being changed properly was sufficient for a jury to infer that the infections and pain resulted from the lack of appropriate attention to his catheter, "a conclusion that seems frivolous to dispute given the extensive medical records of treatment for infections").

In light of the above, there is a genuine issue of material fact whether Harper suffered a constitutional injury, thereby satisfying the first prong under *Monell*.

## 2. Policy or Custom

A policy is "a deliberate choice to follow a course of action" made by the officials or entity "responsible for establishing final policy with respect to the subject matter in question."  *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992).  A policy can be one of action or inaction.  *Long v. Cnty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006).  A "custom" for purposes of municipal liability is a "widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law."  *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it

must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). While one or two incidents are insufficient to establish a custom or practice, the Ninth Circuit has not established what number of similar incidents would be sufficient to constitute a custom or policy. *See Oyenik v. Corizon Health Inc.*, No. 15-16850, 2017 WL 2628901, at *2 (9th Cir. June 19, 2017) (a reasonable jury could conclude that at least a dozen instances of defendant Corizon denying or delaying consultations and radiation treatment for cancer patient over a year amounts to a custom or practice of deliberate indifference) (citing *Oviatt*, 954 F.2d at 1478). But "[t]here is no case law indicating that a custom cannot be inferred from a pattern of behavior toward a single individual." *Id.* Whether actions by entity officers or employees amount to a custom "depends on such factors as how longstanding the practice is, the number and percentage of officials engaged in the practice, and the gravity of the conduct." *Mi Pueblo San Jose, Inc. v. City of Oakland*, C-06-4094 VRW, 2006 WL 2850016, at *4 (N.D. Cal. Oct. 4, 2006)

Defendants assert generally that Harper cannot show Corizon had a policy of deliberate indifference, that Harper cannot show a constitutional violation as a result of any policy, and that there is no probative evidence to support that there was a deliberately indifferent policy. (Doc. 61 at 16, 18.) But Defendants do not specify any alleged deficiency with Harper's evidence. A summary judgment movant must do more than simply assert that the plaintiff has no evidence. *See Celotex*, 477 U.S. at 332 (White, J., concurring) ("[i]t is not enough to move for summary judgment . . . with a conclusory assertion that the plaintiff has no evidence to prove his case"); *id.* at 332 (Brennan, J., dissenting) (a conclusory assertion that the nonmovant has no evidence is insufficient). Instead, Defendants are required to "point to shortfalls in the [plaintiff's] case to demonstrate the absence of evidence . . . ." *See United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1543 (9th Cir. 1989); *see Celotex*, 477 U.S. at 319–20 (the defendants specifically pointed out that the plaintiff "failed to identify, in answering

interrogatories specially requesting such information, any witnesses who could testify about the decedent's exposure to petitioner's asbestos products"). Defendants have failed to show the absence of evidence as to the existence of a policy.

Moreover, the evidence is sufficient to support a policy or custom. Corizon medical staff repeatedly failed to comply with specialist-recommended treatment and Corizon repeatedly denied, cancelled, or ignored treating providers' consults requests for scans, follow up, and specialist appointments. These multiple failures, denials, and delays of medical care did not result from the actions of one or two rogue employees; they occurred over time and involved numerous Corizon employees and officials. *See Henry v. Cnty. of Shasta*, 132 F.3d 512, 521 (9th Cir. 1997) (finding a policy more likely where multiple employees were involved in the constitutional violation). A reasonable jury could find that given the frequency of denials of specialist-recommended treatment and consult requests over a two-year period, medical staff were acting pursuant to Corizon policy or custom. *See Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1194–95 (9th Cir. 2002) (whether a policy or custom exists is normally a jury question).

### 3. Deliberately Indifferent Policy/Moving Force

Because deliberate indifference is exhibited where prison officials deny or delay medical treatment, resulting in harm, *see Wood*, 900 F.2d at 1334, an ongoing policy or practice that denies or delays treating specialist and physician-recommended treatment for a serious medical need and thereby causes harm would constitute a deliberately indifferent policy. To establish that a policy or custom is the "moving force" behind a constitutional violation, a plaintiff must demonstrate a direct causal link between the policy or custom and the constitutional deprivation. *See Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997). The Court has already found a genuine issue of material fact whether there existed a policy or custom of denying or delaying treatment and procedures recommended by the treating specialists and physicians. An obvious consequence of such a policy or custom may be the denial and delay of constitutionally adequate medical care. On this basis alone, the moving-force element is satisfied. *See*

*Brown*, 520 U.S. at 405 ("the conclusion that the action taken or directed by the [entity] . . . itself violates federal law will also determine that the [entity] action was the moving force behind the injury of which the plaintiff complains").

Accordingly, there exists a question of fact as to whether Corizon had a deliberately indifferent policy that deprived Harper of his constitutional rights. The Motion for Summary Judgment as to Corizon will be denied.

## V.    Claims Against Director Ryan

### A.    Individual Capacity Claim[26]

#### 1.    Supervisory Liability

A supervisor may be liable in his individual capacity under § 1983 "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202 (9th Cir 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). Supervisory liability is direct liability, which requires the plaintiff to show that that supervisor breached a duty to the plaintiff that was the proximate cause of the injury. *Redman v. Warden of San Diego*, 942 F.2d 1435, 1447 (9th Cir.1991) (en banc), *abrogated on other grounds by Farmer*, 511 U.S. at 834 (citation omitted). "The law clearly allows actions against supervisors under section 1983 as long as a sufficient causal connection is present and the plaintiff was deprived under color of law of a federally secured right." *Id.* (internal quotation marks omitted). A causal connection can be "an affirmative link" between a constitutional deprivation and "the adoption of any plan or policy by [a supervisor,] express or otherwise showing [his or her]

---

[26] The Court's Screening Order found that Harper stated a claim against Ryan in his official capacity, but Harper also stated a claim against Ryan in his individual capacity. (Doc. 6 at 7; *see* Doc. 1.) *See Romano v. Bible*, 169 F.3d 1182, 1186 (9th Cir. 1999) ("[w]e also have presumed that officials necessarily are sued in their personal capacities where those officials are named in a complaint, even if the complaint does not explicitly mention the capacity in which they are sued"); *see also Entler v. Gregoire*, 872 F.3d 1031, 1034 n.1 (9th Cir. 2017). In their Motion, Defendants recognized a claim against Ryan in his individual capacity and presented argument for summary judgment on this claim. (Doc. 61 at 17 (argument and citations to individual-capacity liability cases).)

authorization or approval of such misconduct." *Rizzo v. Goode*, 423 U.S. 362, 371 (1976). In other words, a supervisor can be liable for creating policies and procedures that violated a plaintiff's constitutional rights. *Hydrick v. Hunter*, 669 F.3d 937, 942 (9th Cir. 2012). The "sufficient causal connection" may be shown by evidence that the supervisor "implement[ed] a policy so deficient that the policy 'itself is a repudiation of constitutional rights[.]'" *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989) (citation omitted). This type of claim against a supervisor does not fail on a state of mind requirement such as intent, knowledge, or deliberate indifference. "Advancing a policy that requires subordinates to commit constitutional violations is always enough for § 1983 liability, no matter what the required mental state, so long as the policy proximately causes the harm— that is, so long as the plaintiff's constitutional injury in fact occurs pursuant to the policy." *OSU Student Alliance v. Ray*, 699 F.3d 1053, 1076 (9th Cir. 2012).

## 2. Discussion

Defendants argue that there is no evidence Ryan was consciously aware of Harper's medical issues and that Ryan had no direct involvement Harper's healthcare. (Doc. 61 at 17.) For these reasons, Defendants maintain that Ryan was not in a position to avert a known risk of harm and failed to do so, and he cannot be liable for an Eighth Amendment violation. (*Id.*)

As stated, supervisor liability does not necessarily require a showing of intent or knowledge if the supervisor advanced a policy that caused harm. *OSU Student Alliance*, 699 F.3d at 1076. The Court has already determined there is a triable issue of fact whether the medical provider with whom Ryan contracted had a deliberately indifferent policy that resulted in the denial and delay of specialist and physician-recommended treatment and caused harm.

Contrary to Defendants' assertion, overt personal participation in Harper's healthcare is not required for supervisory liability under § 1983. *See Redman*, 942 F.2d at 1446 (overt personal participation not required for supervisor liability). Harper nonetheless argues that Ryan had involvement in the alleged constitutional deprivation because Harper

wrote to Ryan on three separate occasions seeking help, and attorney Ms. Lomio wrote to Ryan's counsel and demanded immediate medical care. (Doc. 67 at 13.) The evidence submitted with Harper's Response includes an Inmate Informal Complaint Resolution Harper wrote to Ryan in July 2018, which informed Ryan that Harper's pain medication had been improperly discontinued, his catheter had never been changed on time, and, despite medical orders for regular dressing changes, he had only received two dressing changes in the prior three weeks. (Doc. 68-3 at 6.) Harper also submitted an Inmate Letter directed to Ryan in which Harper stated that it was Ryan's responsibility to ensure that Corizon provided adequate healthcare and that Harper was being denied medications, catheter changes, and dressings, and asked Ryan to address the situation. (*Id.* at 8.) In failing to file a reply brief in support of their Motion, Defendants do not rebut Harper's argument or any of the evidence in his Response, nor do they proffer counter evidence to suggest that Ryan did not receive these communications from Harper. *See Keel v. Dovey*, 459 F. Supp. 2d 946, 951 n.4 (C.D. Cal. 2006) (finding that "since Defendants did not object to the Plaintiff's declarations or otherwise controvert the matters described therein in a Reply, the Court deems such facts undisputed").

Harper proffered copies of the letters that attorney Lomio sent to Director Ryan's counsel in the *Parson*'s action. (Doc. 68-2 at 28–34.) These letters, sent in December 2018, explained that specialist recommendations and consult requests for oncology and urology appointments for Harper had not been complied with or properly addressed, and Ms. Lomio requested that Harper immediately be seen by an oncologist and urologist. (*Id.*) Knowledge of the December 2018 communications regarding Harper's medical issues was imputed to Ryan through his counsel. *See Link v. Wabash R.R. Co.*, 370 U.S. 626, 634 (1962) ("each party is . . . considered to have notice of all facts, notice of which can be charged upon the attorney"); *In re Kensington Int'l Ltd.*, 368 F.3d 289, 315 (3d. Cir. 2004) ("the attorney and client have an agency relationship and therefore any facts known by the attorney may generally be imputed to the client"); Restatement (Second) of Agency § 9(3) (1958) ("[a] person has notice of a fact if his agent has knowledge of the fact . . . ").

Construing the evidence in Harper's favor, Ryan had subjective knowledge of Harper's medical issues, and he was put on notice of deficiencies in the provision of medical care that were preventing Harper from receiving recommended treatment.

The Ninth Circuit has held that a defendant can be liable for a failure to act. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). The Circuit has also held that "a prison administrator can be liable for deliberate indifference to a prisoner's medical needs if he 'knowingly fail[s] to respond to an inmate's requests for help.'" *Peralta*, 744 F.3d at 1085–86 (quoting *Jett*, 439 F.3d at 1098). Ryan, as the ADC Director, had the authority to take action to remedy the alleged violation once he was aware of Harper's medical condition and requests for treatment. A reasonable jury could find that Ryan was aware of Harper's medical issues and failed to act or respond to Harper's requests for help and was thereby deliberately indifferent to Harper's serious medical needs. Accordingly, the Motion for Summary Judgment will be denied as to the individual-capacity claim against Ryan.

### B.     Official Capacity Claim

#### 1.     Legal Standard

"Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent. As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (citing *Monell*, 436 U.S. at 690 n.55). The Eleventh Amendment bars a damages action against a State in federal court; however, it does not bar claims for injunctive relief against individuals in their official capacity. *ACS of Fairbanks, Inc. v. GCI Commc'n Corp.*, 321 F.3d 1215, 1217 (9th Cir. 2003).

To support a claim against a defendant in his official capacity, a plaintiff must demonstrate that a policy or custom of the governmental entity of which the official is an agent was the moving force behind the violation. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Kentucky*, 473 U.S. at 166. That is, the plaintiff must establish an affirmative causal link between the policy at issue and the alleged constitutional violation. *See City of Canton,*

*Ohio v. Harris*, 489 U.S. 378, 385, 391–92 (1989).  With an official-capacity claim, a plaintiff is not required to show a named official's personal involvement in the alleged constitutional violation.  "Rather, a plaintiff need only identify the law or policy challenged as a constitutional violation and name the official within the entity who can appropriately respond to injunctive relief."  *Hartmann v. Cal. Dep't of Corrs. & Rehab.*, 707 F.3d 1114, 1127 (9th Cir. 2013) (citations omitted).

### 2.   Discussion

As mentioned, Harper sought injunctive relief and the Court found that the allegations in Harper's Complaint supported an official-capacity claim against Ryan. (Doc. 1 at 10; Doc. 6 at 7.)  *See Monell*, 436 U.S. at 690–91; *see also* Ariz. Rev. Stat. § 31-201.01(D) ("[t]he director shall provide medical and health services for the prisoners").  In their Motion, Defendants argue that Ryan was not aware of Harper's medical issues and he had no direct involvement Harper's healthcare, but these arguments go to Ryan's culpability in his individual capacity.  (Doc. 61 at 17.)  The Court has already determined that there are questions of fact whether Corizon had a deliberately indifferent policy or custom that deprived Harper of a constitutional right and was the moving force of the violation.  Defendants make no argument that Ryan cannot be held liable in his official capacity for Corizon's alleged deliberately indifferent policy.  Consequently, the Court will deny summary judgment as to the official capacity claim against Ryan.

But Ryan is no longer the ADC Director.  Under Federal Rule of Civil Procedure 25(d), when an officer sued in his or her official capacity dies, resigns, or otherwise ceases to hold office while the action is pending, "[t]he officer's successor is automatically substituted as a party."  David Shinn is the current ADC Director, and he is the proper official to respond to injunctive relief.  Accordingly, David Shinn will be automatically substituted as the Defendant for Harper's official capacity claim for injunctive relief.

## VI.   Conclusion.

The Court is deeply troubled by the facts of this case.  The Court is equally troubled that Defendants would file a motion for summary judgment in light of such facts, fail to

file a reply brief, fail to provide key medical records, and submit records that appear to have been altered, as discussed above. The Court therefore will require that this order be read personally by (a) ADC Director David Shinn, (b) the highest official of Corizon responsible for the operations to which Plaintiff has been subjected, and (c) the Arizona Attorney General. Although Director Shinn bears the responsibility of executing any injunctive relief, because Centurion of Arizona is the current contracted health care provider and thus should be aware of Harper's condition, the Court will also require that this order be read by the Centurion Statewide Medical Director. Defendants shall file a certification within 30 days that this order has been read – personally – by each of these individuals.

The Court will also seek to identify counsel willing to represent Plaintiff on a pro bono basis throughout the remainder of this case. Defendants are directed to have no settlement discussions with Plaintiff until counsel has appeared on his behalf.

**IT IS ORDERED:**

(1)     This order shall be read personally by (a) ADC Director David Shinn, (b) the highest official of Corizon responsible for the operations to which Plaintiff has been subjected, (c) the Arizona Attorney General, and (d) the Centurion Statewide Medical Director. Defendant shall file a certification within 30 days that this order has been read – personally – by each of these individuals.

(2)     The Court will seek to identify counsel willing to represent Plaintiff on a pro bono basis throughout the remainder of this case. Defendants are directed to have no settlement discussions with Plaintiff until counsel has appeared on his behalf.

(3)     The reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. 61.)

(4)     Defendants' Motion for Summary Judgment (Doc. 61) is **denied**.

(5)     David Shinn is substituted as Defendant for Plaintiff's official capacity claim for injunctive relief.

(6)     The remaining claims are the Eighth Amendment claim for damages against

- 43 -

Corizon; the Eighth Amendment claim for damages against Ryan in his individual capacity; and the Eighth Amendment claim for injunctive relief against Shinn in his official capacity.

(7)     This action is referred to Magistrate Judge Michael T. Morrissey to conduct a settlement conference on Plaintiff's remaining claims.  The Court requests that Judge Morrissey not schedule the conference until after counsel has appeared in this case for Plaintiff.

Dated this 19th day of February, 2020.

David G. Campbell
Senior United States District Judge